[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 14, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-15406
Non-Argument Calendar

_____

D. C. Docket No. 04-02515-CV-CAM-1

KATHERINE E. HANKINS,

Plaintiff-Appellant,

versus

AIRTRAN AIRWAYS, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(June 14, 2007)**

Before ANDERSON, BIRCH and BARKETT, Circuit Judges.

PER CURIAM:

After appellant Katherine Hankins ("Hankins") was terminated from her

probationary term of employment with AirTran Airways, Inc. ("AirTran"), she brought an action against AirTran pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., ("Title VII"). Hankins, who is white, alleged that she had been discriminated against on the basis of her race. She asserted counts against AirTran for race discrimination; hostile work environment; and improper retaliation. AirTran moved for summary judgment on all of the counts asserted by Hankins, which the district court granted. Hankins now appeals, contending that the district court erred in granting summary judgment for AirTran on her retaliation claim.[1] Upon review of the record, we AFFIRM.

## I. BACKGROUND

The evidence, which we view in a light most favorable to Hankins as the party against whom summary judgment was entered, is as follows. Hankins was employed as a flight attendant with AirTran from 16 May 2003 until 29 September 2003, the date on which she was discharged. Throughout the time that Hankins was employed with AirTran, her status was that of a probationary employee. During her employment, Hankins, who is a white female, was supervised by Maya

---

[1] On appeal, Hankins does not challenge the district court's grant of summary judgment in favor of AirTran with respect to her race discrimination claim (Count I) or her hostile work environment claim (Count II). Therefore, we address solely the grant of summary judgment on the retaliation claim. See AT&T Broadband v. Tech Commc'ns Inc., 381 F.3d 1309, 1320 n.14 (11th Cir. 2004) (citation omitted) ("Issues not raised on appeal are considered abandoned.")

Durham, an African-American female, who was the "in-flight supervisor" for all probationary flight attendants. As such, Durham was responsible for overseeing a panoply of performance issues related to probationary flight attendants, including their personal appearance; their in-flight professional conduct; their punctuality; their overall preparedness; and their familiarity with both FCC regulations and the in-flight equipment.

Apparently, Durham was sometimes abrasive in her interactions with probationary employees; Allison Head, who is white and is the base manager that supervised Durham, stated that she had received some complaints that Durham could be "very harsh" and "abrasive" when speaking to her subordinates. R3-56 at 14, 22. Durham herself agreed that she sometimes intimidated her trainees, because her job was to convey "very tough" information to probationary employees about the company's expectations of them once they became flight attendants. R3-55 at 34-35. Hankins has further alleged that Durham also had a clear racial bias against whites, and has stated that it was well-known among the flight attendants -- primarily through workplace gossip -- that Durham subjected white trainees to different treatment than African-American trainees, and that she subjugated the former to "constant harassment." R2-34 at 61.

Three disputes involving Hankins and Durham are pertinent to this appeal.

3

The first, on 31 May 2003, involved Hankins' travel bag, which was allegedly overstuffed and too large to fit in an overhead compartment while in-flight. Instead, Hankins strapped her suitcase into an empty seat on the plane, in violation of both AirTran's policies and FCC regulations. Shari Gunnin, the lead flight attendant on the flight, reprimanded Hankins for this behavior, and later filled out a report detailing the incident. Durham was not present for this incident. Hankins claims that Gunnin was "rude" and "unpleasant" to her, simply because she "[did] not like [her]." R1-1 at 3; R2-34 at 100-101. Hankins also claims that after the flight was over, she advised Durham that Gunnin would likely write her up, due solely to her personal dislike of her, and that Durham reassured Hankins that "everything's fine" and that she should not "worry about it." R2-34 at 101. Later, when Gunnin's incident report was in fact filed, Durham called Hankins into her office. Hankins explained to Durham that the incident had been mis-characterized and asked Durham to remove the incident report from Hankins' file, but Durham refused, stating that the report was required to remain in her file for twelve months.

The second incident occurred on 18 June 2003, during a "check ride"[2] on a DC-9 airplane on which Durham was observing Hankins and two other probationary flight attendants. Hankins was less familiar with the DC-9, and was

_____

[2] A "check ride" is a formal evaluation of a flight attendant's performance during a real flight. See R2-34 at 40.

unaware that the power on a D-9 airplane cuts off when it backs away from the terminal. During Hankins' presentation over the plane's intercom, the power cut off, and, unbeknownst to Hankins, her voice was temporarily inaudible to the passengers. Durham later informed Hankins and the other flight attendants that she was going to fail them on the check ride, for failing to re-start the safety demonstration after the power had cut off. The other flight attendants protested this treatment, arguing that Durham had told them while in-flight that they did not need to re-start the safety presentation. In light of these protestations, Durham stated that she chose to "give them the benefit of the doubt," tore up the performance form indicating a failing grade, and gave each attendant a passing score instead. R3-55 at 42-43.

The final incident between Durham and Hankins came in July 2003, while Durham was on board a flight and was observing Hankins in her mandatory pre-flight inspection of emergency equipment. Durham verbally reprimanded Hankins for not checking some of the pieces of emergency equipment, and later wrote up a disciplinary notice -- which she submitted to Head -- detailing Hankins' failure to thoroughly check the equipment. In her report, Durham also recommended that Hankins be sent back to AirTran's flight attendant training program for further training. This recommendation, however, was not heeded. Hankins contends that

Durham had "no reason" for writing her up for this incident, and maintains that Durham simply did not like her "because [she was] white." R2-34 at 68, 78.

When Hankins was called to Head's office on 9 September 2003 to discuss Durham's report, Hankins contends that she told Head that Durham's treatment of her constituted race discrimination. Specifically, Hankins claims that she told Head in that meeting that Durham did not like white employees, that Durham constantly harassed her fellow white trainees, and that such discrimination had been an ongoing problem under Durham's supervision.

Following these incidents with Durham, on 14 September 2003, Hankins had a run-in with Adam Kerstetter, a flight attendant, while they were waiting in line for the employee bus. After Kerstetter cut in front of Hankins in line, Hankins yelled at Kerstetter and told him, in front of the other employees, that she "would kick his ass if he ever tried to cut in front of [her] again in line." R2-34 at 124. Although Hankins was joking when she made this statement, she concedes that Kerstetter did not respond as if it were a joke, and that he appeared embarrassed by the confrontation. In fact, Kerstetter filed a letter to his superiors complaining of this incident, based on his belief that Hankins' "manner and comment [were] threatening in nature" and were "completely inappropriate and unwarranted" by the circumstances. R1-32, Exh. 1 at 2. After Durham received Kerstetter's letter

6

detailing the incident, she passed it along to Head. Head later met with Kerstetter, and he directly recounted the details of the incident to her.

After the incident, Head reviewed Hankins' file and her overall performance as a probationary employee. Included in Hankins' file were the two incident reports detailing the improper bag checking incident and Hankins' failure to check the in-flight safety equipment. Head had also been concerned that Hankins' personality was "unnecessarily argumentative or combative"; she later stated that the Kerstetter incident had confirmed this initial impression. R1-32, Exh. 5 at 3. Head indicated that new AirTran employees were expected to show a productive and positive attitude, and to demonstrate good judgment and discretion in their interaction with others, and that Hankins' conduct toward Kerstetter had fallen short of that standard. Thus, Head contacted Susan Manfredi, Vice-President of In-Flight Services, and Amy Morris, Director of Employee Relations and Diversity, recommending Hankins' termination. Manfredi authorized Head to discharge Hankins.

On 29 September 2003, Head met with Hankins and notified her that she was being discharged because she had failed to successfully complete her probationary period as a flight attendant, and had violated Rules 1 and 14 of the Airtran Airways Crew Member Handbook, which prohibit, respectively,

7

disrespectful, abusive, or unprofessional behavior, and using threatening or abusive language. Head gave Hankins a letter reiterating the basis for this termination decision.

A year later, Hankins filed a charge with the Equal Opportunity Employment Commission ("EEOC"), alleging that AirTran had discriminated against her on the basis of her race and had retaliated against her for complaining internally of such discrimination, in violation of Title VII. After a review, the EEOC notified Hankins that it was unable to find a violation of Title VII, based on the fact that (1) there was no connection between the alleged retaliation and her discharge; and (2) AirTran had provided a legitimate non-discriminatory reason for her termination, one that was not shown to be pretextual.

After the EEOC issued a right to sue letter, Hankins brought the present Title VII action against AirTran in the Northern District of Georgia. She contended that she had been subject to unfair treatment and harassment from Durham on the basis of her race, and that when she had complained about Durham's racial discrimination to her superiors at AirTran -- namely Head -- she had been terminated. Hankins' complaint alleged counts for discrimination on the basis of race (Count I); hostile work environment (Count II); and retaliation for engaging in a protected activity under Title VII (Count III).

8

Hankins' case was referred to a magistrate judge, and, following discovery, AirTran moved for summary judgment on all counts of the complaint. In a report and recommendation ("R&R"), the magistrate judge recommended that summary judgment be granted in favor of AirTran all three counts of Hankins' complaint.[3]

The district court adopted the reasoning of the R&R in full and entered summary judgment for AirTran. Hankins now appeals, arguing that the district court erred in granting summary judgment for AirTran on her retaliation claim.

## II. STANDARD OF REVIEW

"We review a district court's grant of summary judgment under a de novo standard of review." Gibson v. Resolution Trust Corp., 51 F.3d 1016, 1020 (11th Cir. 1995) (citation omitted). In doing so, we apply the same legal standards as those that controlled the district court. Real Estate Fin. v. Resolution Trust Corp., 950 F.2d 1540, 1543 (11th Cir. 1992) (per curiam) (citation omitted). According to those standards, as set forth in Federal Rule of Civil Procedure 56(c), summary

---

[3] As to the discrimination claim, the magistrate judge concluded that Hankins had failed to establish a prima facie case. As to the hostile work environment claim, the magistrate judge determined that the alleged harassment was not sufficiently severe and frequent to taint Hankins' workplace environment, nor had Hankins' shown that Durham's alleged mistreatment of her was done on the basis of her race. Finally, as to the retaliation claim, the magistrate judge determined that this claim failed because, first, the intervening incident with Kerstetter had severed the causal connection between Hankins' protected activity (complaining that Durham was racist) and her eventual termination from AirTran, and, moreover, even if one were to assume a causal connection, AirTran had provided a legitimate, non-discriminatory reason for Hankins' firing, one that had not been shown by Hankins to be pretextual. Accordingly the R&R recommended that summary judgment be granted for AirTran on all of Hankins' counts.

9

judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'" Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999) (citations omitted). "In making this assessment, we review all facts and inferences reasonably drawn from the facts in the light most favorable to the nonmoving party." Id. (citation omitted).

## III. DISCUSSION

Hankins' argument on appeal is two-fold. First, she contends that the district court erred in agreeing with the magistrate judge's determination that she failed to establish a prima facie case of retaliation. Second, she contends that the district court erred in accepting the magistrate judge's conclusion that Hankins failed to demonstrate that AirTran's stated reason for her firing her was pretextual and thus unworthy of credence.[4] We address each in turn.

---

[4] On appeal, Hankins also makes a third argument -- namely that AirTran can be held liable on a "mixed-motive" theory of liability under Title VII, which applies in cases where both legitimate and illegitimate reasons motivated a termination decision. See Desert Palace Inc. v. Costa, 539 U.S. 90, 93, 123 S. Ct. 2148, 2150 (2003); 42 U.S.C. § 2000e-2(a)(1). This argument was not raised in the district court, and neither the magistrate judge nor the district court were provided an opportunity to address this theory of liability. "This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) (citation and internal quotations omitted). Because none of the exceptions to

10

A.  Whether Hankins Established a Prima Facie Case of Retaliation

Hankins first argues that the district court erred in concluding that she had failed to establish a prima facie case of retaliation under Title VII.  She contends that she established the three elements of a retaliation claim, and that the court's determination that her prima facie retaliation case failed on the basis of causation was in error.

"Retaliation is a separate offense under Title VII."  Meeks v. Computer Assocs., 15 F.3d 1013, 1021 (11th Cir. 1994) (citing 42 U.S.C. § 2000e-3(a)).  Title VII's anti-retaliation provision prohibits an employer from retaliating against an employee "because [she] has opposed any practice made an unlawful employment practice" by Title VII, including discrimination on the basis of race.  42 U.S.C. § 2000e-3(a).  The goal of this provision is "prevent[] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees," including freedom from race discrimination.  Burlington N. & Santa Fe R.R. Co. v. White, ___ U.S. ___, 126 S. Ct. 2405, 2412 (2006).  "An employee need not prove the underlying claim of discrimination for the retaliation claim to succeed."  Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999) (citations omitted).

_____

that well-established rule is applicable in Hankins' case, we decline to consider her "mixed-motive" theory for the first time on appeal.  See id. at 1332-1335.

11

To establish a prima facie case for retaliation, the plaintiff must show that: (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there is some causal link between the protected expression and the adverse action. Sullivan, 170 F.3d at 1059. After these elements are shown by the plaintiff, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse employment action. Meeks, 15 F.3d at 1021. In the event the employer offers a non-discriminatory reason for the adverse action in question, the plaintiff must then "demonstrate that [she] will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." Farley, 197 F.3d at 1336 (citation and internal quotation omitted).

Applying that framework to the facts of this case, we find that Hankins presented sufficient evidence to support the first two elements of her prima facie retaliation claim. As to the first element, Hankins engaged in a protected activity by stating to her superior, Allison Head, Hankins' belief that Durham was discriminating against her on the basis of race. Although Head disputes this version of events -- contending that Hankins never told her any such thing -- Hankins has testified unequivocally that she informed Head that Durham discriminated against whites. We also agree that the second element of her

12

prima facie case is satisfied, and that Hankins suffered an "adverse employment action" for purposes of Title VII, in that she was terminated from her position with AirTran. See, e.g., Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) (identifying discharge as an adverse employment decision for Title VII purposes).

We agree, however, with both the magistrate judge and the district court that Hankins failed to satisfy the third element, that is, establishing the causal link between the protected activity (Hankins' complaint of Durham's racial bias) and the eventual decision to terminate her employment. Because we find that Hankins failed to establish the causation prong of her retaliation claim, we agree that summary judgment was appropriate on this count. See Johnson v. Bd. of Regents, 263 F.3d 1234, 1243 (11th Cir. 2001) (stating that "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial") (citation and quotations omitted).

We have stated that a plaintiff alleging a claim for retaliation may establish the causation prong of the prima facie case by "prov[ing] that the protected activity and the negative employment action are not completely unrelated." Meeks, 15

13

F.3d at 1021 (citation and quotation omitted); Farley, 197 F.3d at 1337. Causation may be shown, among other ways, by demonstrating that there is a "close temporal proximity" between the employer's awareness of the protected activity and the adverse employment action. Farley, 197 F.3d at 1337. On appeal, Hankins hinges her argument concerning causation on this "close temporal proximity" notion, arguing that because she reported to Head that Durham was racially biased on 9 September 2003, and she was terminated on 29 September 2003 -- a 20-day gap -- the "close temporal proximity" between the two events exists, and, thus, the causal chain is established. She notes that in other cases, we have been willing to infer causation where the temporal proximity was much longer than 20 days. See, e.g., id. (finding causation where the defendant-employer learned of the employee's filing an EEOC complaint and then fired the employee seven weeks later).

As the magistrate judge noted, however, close temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity. In Whatley v. Metropolitan Atlanta Rapid Transit Authority, for example, our predecessor circuit concluded that even though the plaintiff engaged in protected expression that occurred in close temporal proximity to the adverse employment action, there was no causal connection because the evidence demonstrated that the dismissal was

actually caused by "a culmination of problems growing out of appellant's manner of handling his job, his lack of cooperation within his office, his mismanagement of his staff, his refusal to comply with the terms of his job description, and his refusal to follow instructions from his supervisor."  632 F.2d 1325, 1329 (5th Cir. 1980).  Similarly, in Fleming v. Boeing Company, we held that even though the plaintiff filed complaints of sexual harassment shortly before the employer rejected her application for employment, the plaintiff failed to establish causation, because the record made clear that the employee had not been hired because she had failed to meet the employer's qualifications -- namely, she had failed to pass a typing test, which was a pre-requisite to employment.  120 F.3d 242, 248 (11th Cir. 1997).

Here, it is undisputed (indeed, Hankins herself acknowledges), that on 14 September -- five days *after* Hankins allegedly reported Durham's suspected racial bias to Head -- Hankins yelled at a co-worker for cutting her off in line and stated that she would "kick his ass if he ever tried to cut in front of [her] again in line." R2-34 at 124.  This intervening act of misconduct, which was plainly in violation of Rules 1 and 14 of Airtran Airways Crew Member Handbook, severed the causal connection (if any) between Hankins' initial complaint of discrimination and AirTran's decision to terminate her employment.

Thus we agree with both the magistrate judge and the district court that

15

causation cannot be inferred in Hankins' case simply from the 20-day temporal proximity between her claimed protected expression and her termination. As in Whatley and Fleming, Hankins' failure to meet the performance standards set by the employer broke the causal connection (if any) between the protected activity and her eventual termination. Despite a close proximity in time between these events, the evidence establishes that Hankins' flagrant act of misconduct broke the causal chain. Accordingly, the district court properly concluded that Hankins' prima facie case of retaliation failed on causation grounds, and properly granted summary judgment for AirTran on that basis.[5]

---

[5] Hankins alternatively attempts to establish causation by relying on a "cat's paw" theory of liability. Under this theory, if the plaintiff shows that a colleague with a racial animus lacked the power to terminate an employee, but that the colleague made a biased *recommendation* to her superior that the employee be discharged and that recommendation was followed, it may be inferred that it was the colleague's racial animus was the cause in fact of the termination. The superior who carries out the adverse employment action acts merely as the "cat's paw" for the person with the discriminatory animus. See, e.g., Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331-32 (11th Cir. 1999) (per curiam). To establish causation under such a theory, however, the plaintiff must establish "that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the [colleague's] recommendation, was an actual cause of the other party's decision to terminate the employee." Id. at 1331. That is, in such cases "causation may be established if the plaintiff shows that the decisonmaker followed the biased recommendation without independently investigating the complaint against the employee." Id. at 1332.

Here, the evidence made clear that Head made the decision after an independent assessment of Hankins' conduct –which included a review of the complaint by the victim, Kerstetter, a meeting with Kerstetter to discuss the incident, and a review of Hankins' overall performance as a probationary employee. Durham stated that she played no role in recommending Hankins' termination. Even assuming that Durham prepared a "report" and that the report was biased, because Hankins has not established "that the decisonmaker [that is, Head] followed [Durham's report] without independently investigating the complaint against [Hankins]," she cannot establish a causal connection pursuant to a "cat's paw" theory of retaliation. Id. at 1332.

16

B.  Whether Hankins Demonstrated That AirTran's Reason was Pretextual

Moreover, even if we were to assume that Hankins successfully established the causation prong of her retaliation claim so as to demonstrate a prima facie case of retaliation, we find that AirTran provided a valid, legitimate, and non-discriminatory reason for Hankins termination -- namely, her clear violation of the rules of conduct by her unusually confrontational exchange with a co-worker, coupled with the earlier incidents detailed in her file.  Having successfully "rebut[ed] the presumption of retaliation by producing [a] legitimate reason[] for the adverse employment action," Sullivan, 170 F.3d at 1059 (citation omitted), the burden shifts to Hankins to "demonstrate that [she] will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." Farley, 197 F.3d at 1336.  We conclude, as the district court did, that Hankins has failed to meet this threshold.

After legitimate, non-discriminatory reasons for an employment decision have been given, our case law makes clear that a plaintiff alleging retaliation must show "that the reasons proffered [by the employer] . . . were false and that the real reason was retaliation." Sullivan, 106 F.3d at 1061.  This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence." Carter v. City of Miami, 870 F.2d 578, 584 (11th Cir. 1989) (citations and quotations omitted).

Here, Hankins has failed to demonstrate either that AirTran's decision to terminate her employment was more likely than not motivated by a racist motive, or that its stated explanations for that decision are somehow "unworthy of credence." See id. With respect to the former, the person with the alleged racial bias, Durham, stated that she had no involvement in the decision to terminate Hankins; Head, who is a white female, indicated that she made the decision to terminate Hankins after she learned of Hankins' verbal threat against Kerstetter and reviewed this incident in light of Hankins' overall job performance as reflected in her personnel file. Head reiterated her view that "when a probationary employee [such as Hankins] fails to comply with our rules and policies, and fails to demonstrate good judgment and discretion in her interactions with others, [AirTran] is not inclined to continue employment." See R1-32, Exh. 5 at 3. Put simply, Hankins has failed to show that it was more likely that Head's decision to terminate her probationary term of employment was actually motivated by a discriminatory motive. See Carter, 870 F.2d at 584.

In addition, Hankins has failed to demonstrate that AirTran's proffered reasons for her termination were pretextual or somehow unworthy of credence.

18

Hankins' argument that the incident with Kerstetter was merely a joke is unavailing, because we have stated that the pretext inquiry is concerned with the employer's *perception* of the employee's performance, not the employee's own beliefs. See, e.g., Cooper v. Southern Co., 390 F.3d 695, 740 (11th Cir. 2004) ("The relevant issue here is not whether [the employee] actually falsified the entry, but rather whether [the employer] honestly *believed* [the employee] falsified the entry."). Here, we are satisfied that AirTran honestly believed its employee, Kerstetter, when he stated that he found Hankins' conduct to be threatening and offensive, irrespective of whether Hankins subjectively intended her behavior to be a joke.

Nor are we persuaded that AirTran's proffered explanations were pretextual based on Hankins' contention that other AirTran employees who engaged in similar acts of misconduct were not terminated. Hankins argues that an African-American colleague of hers, Calvin Nared, engaged in a "fight" with a co-worker and was not fired, whereas she was fired for using harsh language to her colleague, Kerstetter. Nared, however, is not a valid comparator to Hankins' case. We have made clear that, when a plaintiff seeks to point out a workplace comparator who was treated less severely than the plaintiff, the "quantity and the quality of the comparator's misconduct [must be] *nearly identical* to prevent courts from second-

19

guessing employers' reasonable decisions and confusing apples with oranges."

Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (emphasis added). Here, Hankins' discharge came not only after the altercation incident with Kerstetter, but also after two other incidents of misconduct over a short period of four months. These additional incidents -- her strapping a suitcase into a passenger seat instead of the overhead bin, and her failure to properly check safety equipment -- were both detailed in her file and were considered by Head in making the ultimate decision to terminate her. In light of that evidence, the alleged misconduct of Nared (a single fight with a co-worker, the facts of which are not known) is distinguishable from her misconduct, both in terms of quality and quantity. See, e.g., id. at 1369 (finding that plaintiff has failed to show a similarly situated employee where each of the putative comparators "was involved in a single incident of misconduct, whereas [the plaintiff] committed at least four policy violations").

In summary, AirTran has proffered legitimate, non-discriminatory reasons for Hankins' termination, by pointing out that she committed errors of professional judgment during her probationary period of employment and violated the rules of employee conduct by verbally abusing her co-worker, Kerstetter. Because we find that the proffered reasons for the termination are those that "might motivate a

20

reasonable employer," the burden is on Hankins to meet those reasons head on and rebut them. See Chapman v. AI Transport, 299 F.3d 1012, 1030 (11th Cir. 2000) (en banc). This Hankins has failed to do. Hankins has failed to point out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [AirTran]'s proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and quotation omitted). Thus, summary judgment was appropriate on her retaliation claim. See Cooper, 390 F.3d at 725 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant-employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claims.") (citation and quotations omitted). We discern no error in the judgment of the district court.

## IV. CONCLUSION

Hankins appealed the district court's decision to grant summary judgment in favor of AirTran on her claim of improper retaliation in violation of Title VII. Upon careful review of the record and the parties' briefs, we agree with the district court that Hankins failed to establish the causation element of a prima facie case of retaliation, and, in addition, that she failed to show that AirTran's legitimate, non-

21

discriminatory reasons for her termination were in any way pretextual or unworthy

of credence.  Consequently, we conclude that the district court acted properly in

granting summary judgment for AirTran on Hankins' retaliation claim.  The

judgment of the district court is **AFFIRMED**.