Jacquelyn **SCARBARY**, Plaintiff,

v.

**GEORGIA DEPARTMENT OF NATURAL RESOURCES,** Defendant.

**CIVIL ACTION NO. 1:15–CV–2183–SCJ**

United States District Court, N.D. Georgia, Atlanta Division.

Filed 03/24/2017

James E. Radford, William Caleb Gross, Radford & Keebaugh, LLC, Decatur, GA, for Plaintiff.

Kimberly Blue Lewis, Annette Marie Cowart, Courtney Poolé, Office of State Attorney General, Atlanta, GA, for Defendant.

## ORDER

HONORABLE STEVE C. JONES, UNITED STATES DISTRICT JUDGE

Before the Court in this Title VII retaliation case is the Magistrate Judge's Report and Recommendation (R & R) that Defendant's motion for summary judgment be granted. Doc. 55.[1] Jacquelyn Scarbary objects.[2] Doc. 58. Incorporating the facts and procedural history set forth in the R & R, the Court examines its recommendations and Scarbary's objections.

## I. BACKGROUND [3]

Georgia's Department of Natural Resources' (DNR) Environmental Protection

---

1. All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

2. "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to." Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988); see also United States v. Govea–Vazquez, 962 F.Supp.2d 1325, 1326–27 (N.D. Ga. 2013) ("Where no objection to the R & R is made, it need only be reviewed for clear error."). When a party files proper objections, the Court must "make a *de novo* determina-

tion of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). After conducting this review, the Court "may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge." Id. The Court may also "receive further evidence or recommit the matter to the magistrate judge with instructions." Id.

3. The following facts are presented in the light most favorable to Scarbary (the non-moving party).

Division (EPD), like almost every government agency, suffered budget cuts during the 2008 recession. Doc. 35–2 at 6. In "early 2011," EPD disbanded its Emergency Response Team (ERT) and created the Emergency Response Network (ERN). Id. ERT members had full-time positions, whereas the ERN scraped together people from various groups on a volunteer, part-time basis. Scarbary volunteered to serve as an assistant on the ERN. Id. at 8.

In addition to volunteers, the ERN had four or five more permanent members (doc. 50 at 2–3), including Jerald Campbell, with whom Scarbary worked in her capacity as an assistant. Doc. 35–2 at 8. Campbell and Scarbary had a "flirty" relationship characterized by suggestive comments from Campbell with little to no in-kind response from Scarbary. Id. at 8–9. Eventually, because Campbell was good friends with the ERN's manager, Scarbary approached Campbell about becoming a core member of the ERN. Doc. 43–1 at 6.

Campbell then asked her "[w]ell, what do I get?" Id. Scarbary asked "what do you want," which prompted Campbell to request that she send him revealing pictures via personal email. Doc. 35–19 at 58. She asked if that would get her the job—Campbell confirmed that it would. Id. at 63. So, Scarbary sent him nude pictures taken for her then-boyfriend.

Sometime thereafter, in late–2011, Scarbary received a more permanent position on the ERN. Doc. 43–1 at 7. Two years after that, Defendant reversed the recession-induced reliance on the ERN and re-established a permanent ERT. Doc. 35–2 at 11. Campbell became its manager. Id. He recommended six people for positions on the ERT, but did not choose Scarbary. Id. at 12.

Miffed, Scarbary discussed the situation with her direct supervisor, David Reuland.

In that conversation, she mentioned the nude photos and "that she should have reported Campbell for sexual harassment because he had coerced her into sending" them. Doc. 43–1 at 8. EPD policy required Reuland to report Scarbary's story to his supervisor.

That report eventually landed in front of Randall Harris, EPD's human resources manager. Doc. 35–2 at 14. Harris began an investigation by asking Reuland to write down his recollection of his conversation with Scarbary. Id. at 15. Reuland reported that Scarbary "told him she felt pressured to send nude photos of herself to Campbell in order to secure a permanent position on the ERT team, a position for which she had applied and that Campbell, as manager, would be filling." Id. His memo to Harris included nothing about when Scarbary said that she sent the pictures. See doc. 35–5 at 23.

Harris also talked to Scarbary directly, though with another HR employee present. Doc. 35–2 at 16. During the pre-test interview, Harris asked Scarbary when she sent the photos to Campbell. Id. The record contains no transcript of that interview, but Harris testified that he "understood Scarbary to say the photos were sent [in] approximately" 2013. Id. By contrast, a contemporaneous memo that Harris wrote about the interview contains no indication that Scarbary said anything about when she sent the pictures. Doc. 35–5 at 26. The memo does, however, contain Campbell's estimate of when the events transpired. Id.

Because the matter amounted to a "he said, she said," Harris next ordered that Campbell and Scarbary undergo a Georgia Bureau of Investigation (GBI) polygraph test. During that interview, conducted by GBI agent Ben Hanson, Scarbary consis-

tently stated that she sent the photos in 2011, not 2013. She also maintained that the Campbell coerced the pictures and that she never consented. Scarbary never admitted that she ever provided Harris or anyone else incorrect information about the incident and its timing, though she did confess to a bad memory for dates and some possibility that the ERT–ERN organizational shifts within EPD may have contributed to a garbled retelling.

Ultimately, Hanson decided against administering the polygraph after it became apparent that Campbell and Scarbary's stories about the incident largely matched. Five days later, Harris wrote a memo to Mary Walker, EPD's Assistant Director (who previously approved the polygraph), recommending that she fire Scarbary. Doc. 35–5 at 28. In it, Harris wrote, among other things, that Scarbary stated that the nude photo incident "was not sexual harassment but a consensual act;" that Hanson's supervisor told Hanson during the interview that he need not conduct a polygraph because of that admission; that Scarbary's statements "changed to match Mr. Campbell's;" and that she "admitted to [Hanson] that she gave incorrect information to the EPD investigators." Id.

Walker approved Scarbary's termination that same day (June 17, 2014) (doc. 35–5 at 28) without conducting any independent

investigation.[4] Doc. 35–13 at 4. Walker testified that she based her decision on Harris' report (the second paragraph, in particular), a prior incident where Scarbary received a reprimand for misusing an EPD gas card, and Harris' indication that Scarbary's "supervisors were not generally strong supporters of her." Id. DNR's human resources director at the time, Jim Laine, testified that he also recommended that Walker terminate Scarbary because of the allegations in Harris' report. See doc. 35–14 at 16 (Scarbary's "untruthfulness in the course of the investigation" as described in Harris' memo "was the ultimate factor that led to termination").

Less than two months later Scarbary complained to the Equal Employment Opportunity Commission. After receiving a right-to-sue letter, she filed this action. Doc. 1. Eventually Defendant moved for summary judgment. Doc. 35. The Magistrate Judge later recommended that the Court grant the motion and dismiss Scarbary's complaint. Doc. 55.

### A. The R & R

Scarbary pled three different theories of retaliation-based liability (i.e., types of complaints that she arguably made that allegedly spawned retaliation): (1) hostile work environment; (2) sex discrimination; and (3) *quid pro quo* sexual harassment.[5]

---

4. Walker's deposition testimony paints a mixed portrait of whether she investigated independently, or simply accepted Harris' recommendation. At one point, she indicates some knowledge of information not included in the recommendation. Doc. 35–13 at 5. At another, she admits that she did not independently investigate. See id. at 4 ("Q: Other than talking with Mr. Harris about this investigation, did you do any independent investigation? A: Not that I'm aware of, no."). The facts outlined above reflect the requisite con-

struction of that conflicting testimony in the light most favorable to Scarbary.

5. "Title VII ... prohibits retaliation against an employee 'because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder].' 42 U.S.C. § 2000e–3(a). A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under

The Magistrate Judge concluded that Scarbary failed to establish *prima facie* cases under the first two. Scarbary does not contest those conclusions. Finding no clear error, the Court agrees. It thus **GRANTS** Defendants' summary judgment motion as to Scarbary's hostile work environment and sex discrimination-based retaliation claims.

The R & R also found that Scarbary established a *prima facie* case of *quid pro quo* sexual harassment. Doc. 55 at 27. Turning to step two of the analysis, the Magistrate Judge found—and Scarbary does not contest—that Defendant offered legitimate, non-discriminatory reasons for her termination: "(1) Plaintiff's untruthfulness during Defendant's internal investiga-

tion into Plaintiff's sexual harassment allegations; (2) Plaintiff's prior disciplinary episode for misusing state resources; and (3) reports from Plaintiff's supervisors that she was not a 'significant program asset.' " Id. at 49.

The burden thus shifted back to Scarbary to show that those reasons were mere pretext for unlawful retaliation. Because Scarbary plied a "cat's paw" theory of liability,[6] the R & R first looked at who within the Department of Natural Resources (DNR) actually made the decision to terminate Scarbary. It concluded that Scarbary presented enough evidence to argue that Mary Walker, EPD's Assistant Director, " 'rubber-stamped' " the termination recommendation of Randy Harris,

---

Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008). To hurdle summary judgment on a retaliation claim using circumstantial evidence, a plaintiff must first make out the aforementioned *prima facie* case. Then, the employer bears the burden of providing a legitimate, non-retaliatory reason for the adverse employment action. See Bryant v. Jones, 575 F.3d 1281, 1308 (11th Cir. 2009) ("Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action."). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and drops from the case. After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." Id. (quotes and cites omitted).

**6.** As the Magistrate Judge correctly observed:

An adverse employment action recommendation by a person with no power to actually discharge an employee may be actionable if the plaintiff proves that the recommenda-

tion directly resulted in the employee's adverse employment action. Záklama v. Mt. Sinai Medical Center, 842 F.2d 291, 294 (11th Cir. 1988); see also Staub v. Proctor Hosp., 562 U.S. 411, 420–21 [131 S.Ct. 1186, 179 L.Ed.2d 144] (2011) ("[T]he supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified."). The plaintiff may use the so-called "cat's paw" theory to prove that the discriminatory animus behind the recommendation caused the discharge. Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). "This theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." Id. In other words, "the recommender [uses] the decisionmaker as a mere conduit, or "cat's paw" to give effect to the recommender's discriminatory animus." Id.; see also Llampallas v. Mini–Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998) ("In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers").
Doc. 55 at 54.

EPD's Human Resources Director. Doc. 55 at 55.

Scarbary's pretext burden, however, did not end there. Instead, said the Magistrate, she had to demonstrate that Harris "harbored retaliatory animus such that the reason his report to Walker contained inaccuracies or was false was due to discrimination." Doc. 55 at 56. The R & R found no such evidence. Id. It therefore concluded that:

> As a result, whether Walker conducted an independent investigation or not following Harris's recommendation, Plaintiff's pretext argument fails because she has not demonstrated that retaliatory animus motivated Harris's allegedly false or incorrect report. Merely showing that a proffered reason was based on incorrect information does not establish a genuine issue of material fact that the proffered reason was a pretext for discrimination.

Id. at 57.

Even if Scarbary had shown Harris' animus, she failed, according to the Magistrate Judge, to "rebut each of the reasons that Defendant gave for terminating her." Id. Instead, she asserted that testimony from DNR's HR Director, Jim Laine, confirms that Harris' recommendation drove the termination decision (i.e., that the other two reasons, standing alone, would not have resulted in Scarbary's release). Faced with that evidence, Scarbary claimed she need not show that Defendant's non–Harris reasons amounted to pretext.

The Magistrate disagreed, observing that a "non-decisionmaker's opinion on the weight of each of the termination reasons had on Walker's decision to discharge Plaintiff does not create a genuine issue of material fact that Walker's non-investiga-

tion related reasons for terminating Plaintiff were merely pretext." Doc. 55 at 59. What's more, Scarbary failed to show "that her prior disciplinary record or the other supervisors' assessments, or the report of her prior disciplinary history or the supervisors' assessments, were false and were motivated by retaliatory animus." Id. The R & R accordingly recommends rejecting her pretext arguments, and thus her *quid pro quo* sexual harassment-based retaliation claim.

## B. Scarbary's Objections

Scarbary plies two objections. First, she contends that "[t]he R & R misstates and misapplies the law regarding the effect of the plaintiff's *prima facie* case when combined with evidence that the employer's reason for termination is false." Doc. 58 at 5. To Scarbary, the Magistrate Judge imposed a "pretext plus" requirement by concluding that she failed to show that Harris harbored retaliatory animus. Doc. 58 at 6. Her *prima facie* case, combined with undisputed evidence that Harris' recommendation's "numerous falsehoods," sufficed, she insists, to create a genuine pretext dispute that survives summary judgment. Id. at 7.

Scarbary also objects to the "[t]he R & R's finding that Scarbary cannot rebut each purported reason for her termination." Id. at 8. The other reasons—her past citation for misuse of a DNR fuel card, and general unimpressive performance—Scarbary insists never amounted to independent termination reasons prior to the R & R. Id. at 9. Instead, "[a]bsent Harris' recommendation ... Scarbary would not have been terminated." Id.

"[A] plaintiff's ability to show pretext," says Scarbary, includes "showing 'that the

employer's proffered explanation is unworthy of credence,' " not simply that the stated reasons are false. Doc. 58 at 10 (emphasis omitted) (quoting Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). She made that showing (so says Scarbary) by pointing out that the fuel card discipline occurred "over a year earlier," and resulted in a written warning, not termination. Id. at 11. As for her performance, Scarbary notes that it never before justified termination either. Id. at 12. The timing of Walker's termination decision (the same day as Harris' recommendation) suggests that her performance, too, "would not have resulted in termination." Id. At a minimum, says Scarbary, it is enough, construed in her favor, to survive summary judgment.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate when the record evidence, including depositions, sworn declarations, and other materials, shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). All evidence and factual inferences, however, must be viewed "in the light most favorable to the non-moving party," and "all reasonable doubts" resolved in her favor. Id. Nevertheless, should the moving party meet its initial burden to point out the absence of evidence supporting an essential element on which the non-moving party bears the burden of proof, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986);

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. ANALYSIS

The burden-shifting analysis—(1) plaintiff establishes a *prima facie* case; (2) defendant rebuts by providing legitimate, non-discriminatory reasons for adverse employment action; and (3) plaintiff has opportunity to show those reasons are pretextual—alluded to above helps frame issues for litigation in Title VII cases where, as here, the plaintiff lacks direct evidence of retaliation or discrimination. See Flowers v. Troup Cty., Ga., Sch. Dist., 803 F.3d 1327, 1336 (11th Cir. 2015). "[E]stablishing the elements of [that] framework," however, " 'is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion' in Title VII cases. Smith v. Lockheed–Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). The critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's [retaliatory] intent.' " Flowers, 803 F.3d at 1336. With those overarching, substantive principles in mind, the Court addresses Scarbary's two objections

### A. "Pretext Plus" Objection

Once upon a time, circuit precedent guaranteed that Scarbary could "have gotten [her] claims before a jury after making a prima facie case and merely contradicting the [Defendant's] proffered legitimate, nondiscriminatory reason[s]." Flowers, 803 F.3d at 1339. Contradiction alone, though "it is highly suggestive of pretext," sometimes no longer suffices. Id. (citing with disapproval Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997)). Cases arise "where, although the plaintiff has established a prima facie case and set

forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the [employer's] action was [retaliatory]." Id.

■ As noted, "[t]he ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct. In other words, [i]t is not enough ... to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 146–47, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (cites and quotes omitted, alterations and emphasis in original). Nevertheless, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Id. at 147, 120 S.Ct. 2097.

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. See id., at 517, 113 S.Ct. 2742 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Wright v. West, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992);

> see also Wilson v. United States, 162 U.S. 613, 620–621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); 2 J. Wigmore, Evidence § 278(2), p. 133 (J. Chadbourn rev. 1979). Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

> This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

* * *

Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

Reeves, 530 U.S. at 147–49, 120 S.Ct. 2097 (agreeing with Combs, 106 F.3d at 1519).

A superficial reading of Flowers reveals potential conflicts with Reeves. Compare Flowers, 803 F.3d at 1339 ("Because, as discussed above, Flowers has failed to put forth any additional evidence that would support an inference of unlawful discrimination, it is insufficient for Flowers merely to make a prima facie case and—assuming that he could do so—call into question the School District's proffered legitimate, non-discriminatory reason."), with Reeves, 530 U.S. at 147, 120 S.Ct. 2097 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."). Despite those apparent differences (Flowers arguably says *prima facie* case + disbelief + additional evidence = summary judgment survival, while Reeves allows for *prima facie* case + disbelief alone to hurdle a Rule 56 motion), the two cases do not in fact lock horns.

To understand why, one must reach back to Combs in 1997. There, the Eleventh Circuit held that an employer could never avoid trial if a Title VII plaintiff put forth (1) a *prima facie* case, and (2) sufficient evidence to disbelieve the employer's proffered nondiscriminatory reason.

Combs, 106 F.3d at 1538; see also Chapman v. AI Transport, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000). Reeves came along and "modifie[d] part of [the] Combs decision" by "tell[ing] us [that] judgment as a matter of law will sometimes be available to an employer in such a case." Chapman, 229 F.3d at 1012 n.11.

As noted above, Reeves gave two examples of such a situation: (1) a record that "conclusively revealed some other, nondiscriminatory reason for the employer's decision;" and (2) when "the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." 530 U.S. at 148, 120 S.Ct. 2097. Flowers is an example of the second situation.

The plaintiff there argued that his employer gave inconsistent reasons for his termination. Flowers, 803 F.3d at 1339. The court "easily reconciled" those reasons, however. Id. Put differently, the plaintiff "created only a weak issue of fact" that could not support an inference of discriminatory intent. Reeves, 530 U.S. at 148, 120 S.Ct. 2097. Flowers, because a Reeves–highlighted exception existed, thus granted the employer summary judgment. 803 F.3d at 1339. To the extent that Flowers stands for the proposition that even showing that an employer's explanation for termination is "a bald-faced lie" (id.), will not surmount summary judgment, the Court notes both that that observation is dicta, and that Reeves, a Supreme Court decision, controls.

▪ Scarbary claims that Harris' recommendation contained "numerous falsehoods" that show that he "did not, in fact, base his subjective assessment on a good

faith analysis of the facts." Doc. 58 at 7. In particular, she highlights Harris' report that Scarbary, during her interview with GBI Agent Hanson, "stated that it was not sexual harassment but a consensual act." Doc. 58–1 at 1 (Harris recommendation letter).

As it turns out, that's not true. Scarbary, according to Hanson, never said "that it wasn't ... some level of coercion involved." Doc. 35–16 at 6 (Hanson deposition). Instead, she consistently described the incident as coercive. See id. ("Q: The way she described it to you was some form of coercion? A: Yes, sir."). A review of the GBI interview transcript confirms that Scarbary never stated that Campbell's picture solicitation qualified as consensual.[7]

Harris also reported to Walker that "Scarbary admitted to [Hanson] that she gave incorrect information to the EPD investigators that Mr. Campbell solicited nude photos for his influence to have her placed on the ERT" (doc. 58–1 at 1), when in fact Scarbary never made such an admission. In fact, Hanson told Scarbary directly that neither she nor Campbell were "lying," and that "we don't have a liar in this situation." Doc. 35–19 at 76.

Finally, Harris' letter stated that Hanson's supervisor, "who was listening to the interview [of Scarbary], notified [Hanson] that this no longer required a polygraph test because Ms. Scarbary admitted that it was not sexual harassment." Id. When asked whether his supervisor "ever called [him] out of [the] interview or spoke to [him] while [he was] conducting [the] interview," however, Hanson testified that he had not. Doc. 35–16 at 7. Review of the transcript of Hanson's interview with Scarbary indicates that he spoke with his supervisor once because Hanson had a file on a desk that others in his department were trying to locate. See, e.g., doc. 35–19 at 60. The transcript never shows, and Hanson never testified to as much, that Hanson spoke with his supervisor about anything related to Scarbary or that investigation, much less that the supervisor recommended foregoing the polygraph because of Scarbary's admissions.

Hanson asked Scarbary "[a]nd then you said since you already had 'em on your phone that, hey, it's *no big deal*, you'll send 'em to him." Id. at 84. She responded: "Yeah." Id. (emphasis added). Scarbary then confirmed that Campbell never threatened her, but immediately emphasized that she would "have never gotten on the team" if she hadn't agreed to send the photos. Id.

Defendant contended that Harris could reasonably construe Scarbary's agreement with Hanson's use of the italicized words "no big deal" "as an 'admission' that the photos were sent willingly." Doc. 49 at 16. True. *But that's stretching it and that's only one possible explanation.* The other, more sinister, reason is that Harris, upset with Scarbary for whatever reason, pushed the bounds of plausible interpretation in a retaliatory effort to paint her in a bad light. It is that latter construction that controls on summary judgment.

---

7. In its summary judgment briefing, Defendant plucks three words from the GBI interview and claims they show that Scarbary "admitted" that the photo exchange was consensual. See doc. 49 at 16. The full picture is somewhat different. By that point in the interview, Hanson had decided not to conduct the polygraph. Harris had entered the room and communicated that his notes from a previous conversation with Scarbary did not match her timeline given in the GBI interview. Doc. 35–19 at 81.

Scarbary disputed that her story had changed, and in doing so related her version of events in such a way that confusion over dates might arise. See id. at 81–82. Hanson then stepped in and began questioning Scarbary, leading her through the story she told during the previous portions of the interview. Id. at 82–84. Using leading questions to describe the conversation that preceded the picture exchange, and having just passed the point where Cambell asked for nude photos,

Rather, it shows that Hanson, a little more than two thirds of the way into the interview, abruptly interjected that he was "at a crossroads" with Scarbary that was "for [her] benefit," and would "put a little smile on [her] face." Id. at 67–68. That crossroads? That he felt that a polygraph could not "ethically ... be done" because Scarbary's story, which matched Campbell's, did not match the story that Harris relayed to Hanson before the interview. Id.

Those undisputed portions of the record confirm that Harris' termination recommendation letter contains several pieces of incorrect information. The issue, then, becomes whether the presence of those false statements in Harris' recommendation is sufficient evidence for a reasonable jury to reject Defendant's legitimate, nondiscriminatory reason for Scarbary's termination. Reeves, 530 U.S. at 140, 120 S.Ct. 2097.

The existence of those statements, at a minimum, undermines Harris' conclusion— the primary reason for Scarbary's eventual termination—that Scarbary lied during the investigation by casting doubt on the accuracy of his interpretation of events.[8] At

worst, it undermines Harris' credibility and calls into question his motive behind concluding that Scarbary lied and recommending her termination (why blatantly misstate what Scarbary said in her GBI interview if not to paint her in a poor light?).[9] At this stage, because (1) the Court must assume the latter, see Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1311 (11th Cir. 2012) ("At the Rule 56 stage, where reasonable inferences are to be drawn in favor of the party opposing summary judgment, the district court should not have placed a gloss on the remarks in favor of [Defendant]."), and (2) Scarbary adequately pled a cat's paw liability theory,[10] Harris' recommendation's incorrect information thus constitutes "sufficient evidence to reject the defendant's explanation." Reeves, 530 U.S. at 148, 120 S.Ct. 2097.

As noted, that rejection, coupled with a *prima facie* case, can (but need not always) create a legitimate inference of retaliatory intent. Id. see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("The

---

**8.** Scarbary's recall and retelling of the conduct underlying her sexual harassment complaint was at times spotty and disjointed, leading to some confusion about what happened and when, and possibly explaining Harris' inaccurate portrayal of events. Harris, too, was, at least in Hanson's estimation, inexperienced at handling such investigations. See doc. 35–19 at 79 ("Like I said, I think [Harris has] kind of dealt with Human Resource—and he told me this himself—he's dealt with Human Resource type issues before ... [b]ut not to this magnitude."). Scarbary's somewhat foggy memory, and Harris' unfamiliarity with complex investigations could have conspired to create misunderstanding (without retaliatory intent) that ultimately underlay his views on what transpired.

**9.** Construed favorably to Scarbary, Harris' inexperience also could have led to frustration with the unwieldy investigation and Scar-

bary's role in it. A reasonable jury could infer from that a retaliatory motive underlining his recommendation's exaggerations.

**10.** Defendant unsurprisingly disagrees, and argues that Walker, not Harris, constituted the decisionmaker for purposes of Title VII liability. A reasonable jury could reach that conclusion, but construed in the light most favorably to Scarbary, the Court agrees with the Magistrate Judge that the undisputed evidence creates a genuine "cat's paw" fact dispute. See doc. 55 at 55–56. Indeed, Harris himself admitted that, "to a degree," the investigation "[w]as ... the kind of situation where [he] made recommendations to [Walker], she listened to what [he] had to say and went along with the recommendations." Doc. 35–17 at 32.

factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination"). This is not a case where the record *conclusively* reveals "some other, nondiscriminatory reason for the employer's decision," though the record arguably contains support for such a conclusion. Reeves, 530 U.S. at 148, 120 S.Ct. 2097. Nor has Scarbary created "only a weak issue of fact as to whether [Defendant's] reason was untrue." Id.

Reeves is instructive. There, the employer, after Reeves presented a *prima facie* case of age discrimination, stated that it terminated him because he failed "to maintain accurate attendance records" for, and appropriately discipline, his subordinates. Id. at 138, 120 S.Ct. 2097. Reeves, "however, made a substantial showing that [the employer's] explanation was false." Id. First, he introduced testimony that showed that "[m]ost of the timekeeping errors" his employer cited stemmed from the company's faulty time clock which failed to scan employee time cards. Id. When that happened, Reeves "would visually check the workstations and record whether the employees were present at the start of the shift." Id. That, he said, explained the simultaneous arrival and start times. Id. at

145, 120 S.Ct. 2097. To rebut the disciplinary component of his employer's proffered reason, Reeves testified that his job involved reviewing daily and weekly attendance reports, not the monthly reports from which disciplinary decisions stemmed. Id.

"Based on [that] evidence, the Court of Appeals concluded that [Reeves] 'very well may be correct' that a 'reasonable jury could have found that [his] explanation for its employment decision was pretextual,'" but nevertheless held that Reeves' "showing, standing alone, was insufficient to sustain the jury's finding of liability." Reeves, 530 U.S. at 146, 120 S.Ct. 2097. Instead, the court required a "final step" showing that "age motivated [the employer's] employment decision." Id. "That is, the Court of Appeals proceeded from the assumption that a *prima facie* case of discrimination, combined with sufficient evidence for the trier of fact to disbelieve the defendant's legitimate, nondiscriminatory reason for its decision, is insufficient as a matter of law to sustain a jury's finding of intentional discrimination." Id.

The Supreme Court reversed. Reeves, it said, presented "sufficient evidence to reject [his] employer's explanation." Id. at 149, 120 S.Ct. 2097. When combined with his *prima facie* case, that permitted a finding of liability without the need for additional evidence of discrimination.[11] Id.

In light of Reeves, the Court finds that, considered together, Scarbary's *prima fa-*

---

**11.** Reeves did present additional evidence of discriminatory intent, see Reeves, 530 U.S. at 151–52, 120 S.Ct. 2097, but that played no role in the Court's holding. Instead, it served as icing on a *prima facie* case-pretext rebuttal cake that survived judgment as a matter of law on its own. Justice Ginsburg's concurrence (which dealt with a future need to define Reeves' two exceptions) underscores that understanding. See Reeves, 530 U.S. at 154, 120 S.Ct. 2097 ("The Court today holds that an employment discrimination plaintiff *may*

survive judgment as a matter of law by submitting two categories of evidence: first, evidence establishing a *'prima facie* case,' ... and second, evidence from which a rational factfinder could conclude that the employer's proffered explanation for its actions was false. Because the Court of Appeals in this case plainly, and erroneously, required the plaintiff to offer some evidence beyond those two categories, no broader holding is necessary to support reversal.") (cite omitted, emphasis in original).

cie case and Harris' report's false statements evidence Harris' retaliatory animus. Nothing requires Scarbary to offer something more in order to create a genuine animus-related dispute. "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the [employer's] action was discriminatory." Flowers, 803 F.3d at 1339. This, however, is not that case. Instead, as noted above, the report's falsity and Scarbary's *prima facie* case together can, and in this case do, provide evidence of animus.

Harris' letter made multiple statements contradicted by undisputed evidence. Put differently, Harris did not simply put forth one viable interpretation of what happened with which Scarbary quibbles. Instead, he in essence told Walker that Scarbary said and did certain things that never actually occurred and that no evidence supports.

Contrast that with Reeves' timecard testimony that simply offered an alternate explanation from his employer's for admittedly negative audit results. If that suffices to hurdle summary judgment, Scarbary's repudiation of Harris' letter *a fortiori* does. Because Scarbary, by presenting a *prima facie* case and evidence that Defendant's termination explanation was false, has satisfied her burden to produce evidence from which a fact finder could infer retaliatory animus, the Court **SUSTAINS** Scarbary's "pretext plus" objection.

## B. The "Rebut Each Reason" Objection

Scarbary's alleged mendacity during Harris' investigation constituted only one of three reasons given for her termination.

Scarbary insists that it was the "but for" cause of her termination (i.e., without it she would still work at EPD) and thus implies that she need not rebut the remaining reasons. Doc. 58 at 9. Even were that not the case, she says, Defendant's failure to terminate her following her gas card incident or reports of mediocrity, and the timing of her termination relative to Harris' report, adequately rebuts those reasons. Id. at 11–13.

The pretext prong of the McDonnell Douglas framework, particularly when paired with a "cat's paw" liability theory, can confuse. The critical thing to remember is this: once an employer provides legitimate, nondiscriminatory reasons for terminating an employee, " '[that] framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [i]s discrimination *vel non.*' Reeves, 530 U.S. at 142–43, 120 S.Ct. 2097 (citations and internal quotation marks omitted). The opportunity provided to a plaintiff to show pretext is simply an opportunity to present evidence from which the trier of fact can find unlawful discrimination." Kragor, 702 F.3d at 1308 n.1; see also Smith v. Lockheed—Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (McDonnell–Douglas framework is not "the *sine qua non* for a plaintiff to survive a summary judgment motion' in Title VII cases").

Harris' termination recommendation memo gives only one reason for his preferred course of action: Scarbary's alleged misrepresentations during the investigation. Doc. 58–1 at 1. Walker, on the other hand, says that she considered Scarbary's gas card misuse and mediocrity, too. Doc. 35–13 at 4. Scarbary (as discussed in depth above) adequately rebuts Harris' proffered reason. But, as the Magistrate Judge

notes, she fails to tackle head on Walker's additional reasons.

Scarbary does not deny that she misused a gas card, or attempt to undermine her supervisor's opinions of her work (though she unsurprisingly disagrees with their assessments). She highlights instead that EPD never before cited those rationales to justify termination. Doc. 58 at 11–12. True enough, but that just begs the question, since any legitimate nondiscriminatory reason can be said to have never before supported termination until it in fact does. At bottom, Scarbary never directly undermines the gas card and performance reasons Walker provided.

Nevertheless, Scarbary presents enough evidence to support a "cat's paw" theory of liability. At the summary judgment stage, that means the focus is on Harris, not Walker. It is thus his reason for termination that matters, not the formal ultimate decision maker's (here, Walker). See Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331–32 (11th Cir. 1999); see also Hankins v. AirTran Airways, Inc., 237 Fed.Appx. 513, 521 n.5 (11th Cir. 2007).[12]

A jury in this case could find that Walker rubber-stamped Harris' recommendation and thus that Harris and his termination rationale drove the decision to fire Scarbary. If it does so, the jury could then find that Harris' reason was false and merely pretext for retaliatory intent. A jury could also reject that "cat's paw" theory and find that Walker independently investigated. If it finds the latter, Walker's stated reasons for termination—lying dur-

ing the investigation, gas card misuse, and mediocrity—become relevant, as does Scarbary's failure to head-on rebut them. Indeed, Walker's reasons almost certainly become outcome dispositive, since failure to rebut legitimate non-retaliatory reasons precludes proving retaliatory intent.

That said, admissible evidence supports both avenues. A jury therefore must decide which path to take.

## IV. CONCLUSION

Accordingly, the R & R is **REJECTED IN PART** and **ADOPTED IN PART**. Doc. 55. The Magistrate Judge correctly recommended that the Court grant summary judgment in Defendant's favor on (1) Scarbary's hostile work environment and sex discrimination-based retaliation claim, and (2) her Georgia Whistleblower Act claim.[13] Those portions of the R & R are **ADOPTED** as the Court's opinion and those claims **DISMISSED**.

But the R & R's suggested resolution of the *quid pro quo* sexual harassment-based retaliation claim contains clear error. Scarbary's objections therefore are **SUSTAINED** and the relevant portion of the R & R **REJECTED**. Doc. 55. Defendant's Motion for Summary Judgment (doc. 35) is **DENIED**. The parties are **ORDERED** to submit a proposed pretrial order within thirty days of the date this Order is filed.

**SO ORDERED**, this 24th day of March 2017.

---

12. Walker's reasons do matter, but only insofar as they show that Walker, not Harris, was the actual decision maker. Whether they do is something for the jury to consider since Scarbary presents sufficient evidence to create a genuine dispute regarding who was responsible for her termination.

13. Scarbary never objects to the Magistrate's Whistleblower Act recommendation. Finding no clear error with its resolution of that claim, the Court agrees with the R & R. See United States v. Govea–Vazquez, 962 F.Supp.2d 1325, 1326–27 (N.D. Ga. 2013) ("Where no objection to the R & R is made, it need only be reviewed for clear error.").